21-2726-cv
*Kirschner v. JP Morgan Chase Bank, N.A.*

# In the
# United States Court of Appeals
## for the Second Circuit

---

AUGUST TERM 2022

No. 21-2726

MARC S. KIRSCHNER, solely in his capacity as Trustee of The Millennium Lender Claim Trust
*Plaintiff-Appellant*,

v.

JP MORGAN CHASE BANK, N.A., JP MORGAN SECURITIES LLC, CITIBANK, N.A., BANK OF MONTREAL, BMO CAPITAL MARKETS CORP., SUNTRUST ROBINSON HUMPHREY, INC., SUNTRUST BANK, CITIGROUP GLOBAL MARKETS, INC.,
*Defendants-Appellees*.[*]

---

On Appeal from the United States District Court
for the Southern District of New York

---

ARGUED: MARCH 9, 2023
DECIDED: AUGUST 24, 2023

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

Before: CABRANES, BIANCO, and PÉREZ, *Circuit Judges*.

Plaintiff-Appellant Marc S. Kirschner brought a series of claims in New York state court arising out of a syndicated loan transaction facilitated by the defendants-appellees, a group of financial institutions. Plaintiff's appeal presents two issues. The first issue presented is whether the United States District Court for the Southern District of New York (Paul G. Gardephe, *Judge*) had subject matter jurisdiction over this action pursuant to the Edge Act, 12 U.S.C. § 632. The second issue presented is whether the District Court erroneously dismissed plaintiff's state-law securities claims on the ground that he failed to plausibly suggest that notes issued as part of the syndicated loan transaction are securities under *Reves v. Ernst & Young*, 494 U.S. 56 (1990).

We hold that the District Court had jurisdiction under the Edge Act because defendant-appellee JP Morgan Chase Bank, N.A. engaged in international or foreign banking as part of the transaction giving rise to this suit. We also hold that the District Court did not erroneously dismiss plaintiff's state-law securities claims because plaintiff failed to plausibly suggest that the notes are securities under *Reves*.

We accordingly **AFFIRM** the District Court's September 24, 2018 order determining that it had jurisdiction pursuant to the Edge

Act and **AFFIRM** its May 22, 2020 order dismissing plaintiff's state-law securities claims.

---

CHRISTOPHER P. JOHNSON (Kyle A. Lonergan, Joshua J. Newcomer, and Grant L. Johnson, *on the brief*), McKool Smith P.C., New York, NY, *for Plaintiff-Appellant*.

JEFFREY B. WALL (Christopher M. Viapiano, Zoe A. Jacoby, Ann-Elizabeth Ostrager, and Mark A. Popovsky, *on the brief*), Sullivan & Cromwell LLP, Washington, D.C. & New York, NY, *for Defendants-Appellees JP Morgan Chase Bank, N.A. and J.P. Morgan Securities LLC*.

Benjamin S. Kaminetzky, Lara Samet Buchwald, and Tina Hwa Joe, *on the brief*, Davis Polk & Wardwell LLP, New York, NY, *for Defendants-Appellees Citibank N.A. and Citigroup Global Markets Inc.*

J. Emmett Murphy and John C. Toro, *on the brief*, King & Spalding LLP, New York, NY, *for Defendants-Appellees SunTrust Robinson Humphrey, Inc. and SunTrust Bank.*

Steve M. Dollar and Sean M. Topping, *on the brief*, Norton Rose Fulbright US LLP, New York, NY, *for Defendants-Appellees BMO Capital Markets Corp. and Bank of Montreal*.

---

JOSÉ A. CABRANES, *Circuit Judge*:

Plaintiff-Appellant Marc S. Kirschner brought a series of claims in New York state court arising out of a syndicated loan transaction (the "Transaction")[1] facilitated by the defendants-appellees, a group of financial institutions. Plaintiff's appeal presents two issues. The first issue presented is whether the United States District Court for the Southern District of New York (Paul G. Gardephe, *Judge*) had jurisdiction over this action pursuant to the Edge Act, 12 U.S.C. § 632. The second issue presented is whether the District Court erroneously dismissed plaintiff's state-law securities claims on the ground that he failed to plausibly suggest that notes issued as part of the Transaction

[1] "A syndicated loan is a loan extended by a group of financial institutions (a loan syndicate) to a single borrower." *Syndicated Loan Portfolios of Financial Institutions*, Bd. of Governors of the Fed. Rsrv. Sys., https://www.federalreserve.gov/releases/efa/efa-project-syndicated-loan-portfolios-of-financial-institutions.htm (last visited July 30, 2023); *see also* Fed. Deposit Ins. Corp., Risk Management Manual of Examination Policies, *Loans* § 3.2-73 (May 2023) ("*FDIC Manual*") ("A syndicated loan involves two or more banks contracting with a borrower, typically a large or middle market corporation, to provide funds at specified terms under the same credit facility.").

(the "Notes") are securities under *Reves v. Ernst & Young*, 494 U.S. 56 (1990).

We hold that the District Court had jurisdiction under the Edge Act because defendant-appellee JP Morgan Chase Bank, N.A. engaged in international or foreign banking as part of the Transaction. We also hold that the District Court did not erroneously dismiss plaintiff's state-law securities claims because plaintiff failed to plausibly suggest that the Notes are securities under *Reves*.

We accordingly **AFFIRM** the District Court's September 24, 2018 order determining that it had jurisdiction pursuant to the Edge Act and **AFFIRM** its May 22, 2020 order dismissing plaintiff's state-law securities claims.[2]

## I. BACKGROUND

We describe the facts as set forth in the complaint and the documents incorporated therein.[3] We recount only those necessary to explain our decision.

[2] We address the remaining issues raised on appeal by a summary order entered this same day.

[3] *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) ("A complaint is deemed to include any written instrument attached to it as an exhibit or any statement or documents incorporated in it by reference." (internal quotation marks and citation omitted)).

### A. Millennium

Millennium Health LLC, Inc. f/k/a Millennium Laboratories ("Millennium") was a California-based urine drug testing company. In March 2012, defendants-appellees JP Morgan Chase Bank, N.A. ("JP Morgan Chase"), JP Morgan Securities, LLC ("JP Morgan Securities," and together with JP Morgan Chase, "JP Morgan"), SunTrust Robinson Humphrey, Inc., SunTrust Bank, and Bank of Montreal,[4] executed a credit agreement (the "2012 Credit Agreement") providing Millennium a $310 million term loan and a $20 million revolving loan. Two days before the 2012 Credit Agreement closed, the United States Department of Justice ("DOJ") issued a subpoena to Millennium in connection with an investigation into whether Millennium had violated federal health care laws. At the time, Millennium was also embroiled in litigation with a competitor, Ameritox Ltd. Ameritox alleged that Millennium had violated federal anti-kickback statutes and that such violations "constituted 'unfair competition.'"[5]

As the DOJ investigation and Ameritox litigation continued, JP Morgan began to consider ways to refinance the 2012 Credit Agreement. Plaintiff alleges that "by the end of February 2014," the "only" way to refinance was "a huge institutional financing that

---

[4] We refer to these entities jointly, along with defendants-appellees BMO Capital Markets Corp., Citibank, N.A., and Citigroup Global Markets Inc., as "defendants."

[5] Joint App'x ("J.A.") 29.

would" eliminate the roughly $300 million that Millennium still owed under the 2012 Credit Agreement.[6]

**B. The March 16, 2014 Commitment Letter**

The "huge institutional financing" principally consisted of a $1.775 billion term loan to Millennium (the "Term Loan"). By letter dated March 16, 2014, JP Morgan, Citi,[7] BMO Capital Markets, Bank of Montreal, SunTrust Robinson Humphrey, and SunTrust Bank (the "Initial Lenders") agreed to provide Millennium the Term Loan[8] and a $50 million revolving loan.[9] Millennium, in turn, planned to use the Term Loan to (1) pay the outstanding amount due under the 2012 Credit Agreement ($304 million), (2) pay a shareholder distribution ($1.27 billion), (3) "redeem outstanding warrants, debentures and

---

[6] *Id.* at 32.

[7] The letter defines "Citi" to "mean Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as Citi shall determine to be appropriate to provide the services contemplated herein." *Id.* at 360.

[8] The Term Loan was initially for $1.765 billion and was later increased to $1.775 billion.

[9] The relevant loan documents refer to both the Term Loan and the revolving loan as "Senior Secured Facilities." Plaintiff's claims arise out of events surrounding the Term Loan. *See* J.A. 17 ("This Complaint relates to a $1.775 billion transaction . . . ."). The claims do not rest on allegations involving the revolving loan. For clarity, we refer only to the Term Loan, even when the relevant loan document refers to the "Senior Secured Facilities."

stock options" ($196 million) and (4) pay fees and expenses related to the Transaction ($45 million).[10]

The Initial Lenders and Millennium further agreed that the Initial Lenders could "syndicate the [Term Loan] to a group of lenders identified by the 'Lead Arrangers,'" JP Morgan Securities and Citigroup Global Markets.[11] The Lead Arrangers agreed to "commence the syndication of the [Term Loan] . . . promptly," while Millennium "agree[d] actively to assist the Lead Arrangers in completing a syndication satisfactory to [it] and the Lead Arrangers."[12]

### C. The Confidential Information Memorandum

To facilitate the syndication effort, JP Morgan and Citi prepared a "Confidential Information Memorandum" about Millennium.

---

[10] *Id.* at 582.

[11] *Id.* at 361, 376. The commitment letter further established that JP Morgan Chase would act as the "Administrative Agent," and "in such capacity" be entitled "to exercise such powers and perform such duties as are expressly delegated to" it pursuant to loan documents. *Id.* at 361, 376, 537–38.

[12] *Id.* at 361. In the finance community, a "[l]oan syndication" refers to "[t]he process of involving multiple lenders in providing various portions of a loan." Off. of the Comptroller of Currency, *Leveraged Lending: Comptroller's Handbook* 63 (2008) ("*Comptroller's Handbook*"); *see also supra*, note 1 (providing definitions for "syndicated loan").

The Confidential Information Memorandum most consistently refers to its intended audience as potential "lenders,"[13] although its cover page uses the term "Public Side Investors."[14] The other relevant documents also most consistently employ the term "lender" and not "investor."[15] Accordingly, we too refer to those who purchased Notes as "lenders."[16]

The Confidential Information Memorandum contains numerous disclaimers. For example, it warns potential lenders that the material did "not purport to be all-inclusive" and was "prepared to assist potential lenders in making their own evaluation of [Millennium] and the [Term Loan]."[17] It also advises that each potential lender "should perform its own independent investigation and analysis of the [Term Loan] or the transactions contemplated

---

[13] *See, e.g.*, *id.* at 565 ("The information and documents following this Notice . . . have been prepared from information supplied by or on behalf of Millennium . . . and is being furnished by [JP Morgan Securities] . . . to you as a potential lender . . . .").

[14] *Id.* at 561; *see also id.* at 572 (providing a "Public investors dial-in" number). Similarly, a PowerPoint presentation created by Millennium with help from the Lead Arrangers "recast some of the information" in the Confidential Information Memorandum and was called an "Investor Presentation." *Id.* at 40.

[15] *See, e.g.*, *id.* at 446 (preamble to 2014 credit agreement listing parties thereto, including the "Lenders").

[16] This nomenclature is not dispositive of whether the Notes are "securities" under *Reves v. Ernst & Young*, 494 U.S. 56 (1990).

[17] J.A. 566.

thereby and the creditworthiness of [Millennium]."[18] And by receiving the Confidential Information Memorandum, each potential lender "represent[ed] that it [was] sophisticated and experienced in extending credit to entities similar to [Millennium]."[19]

If a potential lender wanted to become an actual lender, then it had "to make a final legally binding offer to purchase" the Notes no later than 5 p.m. Eastern Standard Time on April 14, 2014.[20]

**D. The Lenders**

On April 15, 2014, JP Morgan Securities notified potential lenders with outstanding legally binding offers of the amount of their allocation. At that point, those potential lenders became *actual* lenders because they were "irrevocabl[y]" bound to purchase their allocation of the Term Loan.[21] Those lenders—referred to here as "Parent Lenders"—could then sub-allocate their allocation to investors in their respective funds—referred to here as "Child Lenders." For example, Brigade Capital Management, LP ("Brigade"), a Parent Lender, was

---

[18] *Id.*

[19] *Id.* Potential lenders made this representation "[b]y accepting the Confidential Materials [in the Confidential Information Memorandum] for review." *Id.* at 565.

[20] *Id.* at 50.

[21] *Id.* at 428 (an "Institutional Allocation Confirmation" sent by a lender to JP Morgan Chase "confirm[ing] [JP Morgan Chase's] offer to sell, and [the lender's] agreement to purchase" the lender's allocated amount of the Term Loan, "which offer and agreement is irrevocable").

allocated $45 million of the Term Loan and then sub-allocated that $45 million allocation among twenty-three Child Lenders.[22]

In total, sixty-one Parent Lenders received an allocation of the Term Loan. Of those sixty-one Parent Lenders, fifty-nine were domestic entities and two were foreign entities. Approximately half of the roughly four hundred Child Lenders were foreign entities.

**E. The Transaction**

The Transaction "proceeded in three inter-related and contemporaneous steps" and closed on April 16, 2014.[23]

*First*, by letter agreement dated April 16, 2014, JP Morgan Securities or its "Lending Affiliate," JP Morgan Chase, agreed to "fund 100%" of the Term Loan.[24]

*Second*, by letter agreement dated April 16, 2014, Millennium consented to JP Morgan Chase assigning its rights and obligations with respect to the Term Loan to the lenders.

---

[22] *See id.* at 423 (email from JP Morgan Securities notifying Brigade of its allocation and providing information on "[l]oan documentation," the allocation, and funding of sub-allocations).

[23] *Id.* at 50.

[24] *Id.* at 400.

*Third*, "each individual [lender] . . . became irrevocably committed to [JP Morgan Chase] . . . to purchase" its allocated amount of the Term Loan.[25]

## F. The Credit Agreement

In connection with the closing on April 16, 2014, each lender executed an "Assignment and Assumption Agreement" with JP Morgan Chase.[26] The lenders thereby assumed "all of [JP Morgan Chase's] rights and obligations in its capacity as a Lender"[27] under a "Credit Agreement" dated April 16, 2014. The Credit Agreement established the conditions of the Term Loan. By entering the Credit Agreement, each lender represented that it had

> independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and

[25] *Id.* at 50–51.

[26] *See id.* at 432–33 (Assignment and Assumption Agreement between JP Morgan Chase and Brigade Credit Fund II, LTD ("Brigade Credit"), a lender organized under the laws of the Cayman Islands).

[27] *Id.* at 432; *see id.* at 446 (defining "Lender[]" as "the several banks and other financial institutions or entities from time to time parties to this [Credit] Agreement").

> creditworthiness of [Millennium][28] and made its own decision to make its Loans[29] hereunder and enter into this [Credit] Agreement.[30]

The Credit Agreement established that Millennium would pay back the Term Loan over seven years. Millennium was generally obligated to make quarterly payments consisting of a portion of the $1.775 billion principal plus interest. Additionally, to protect lenders were Millennium to default on its payment obligations, the Credit Agreement "create[d] in favor of the Administrative Agent [JP Morgan Chase], for the benefit of the Lenders, a legal, valid and enforceable security interest" in Millennium's collateral.[31]

---

[28] The Credit Agreement required that each lender make its own appraisal of, and investigation into, not only Millennium, but also Millennium's "Restricted Subsidiaries" as well as Millennium Lab Holdings II, LLC and its "Restricted Subsidiaries." *See id.* at 539 (Credit Agreement provision referencing "Loan Parties"); *id.* at 468 (defining "Loan Parties" as "each Group Member that is a party to a Loan Document"); *id.* at 464 (defining "Group Members" as "the collective reference to Holdings, the Borrower and their respective Restricted Subsidiaries"); *id.* at 446 (defining Millennium Lab Holdings II, LLC, as "Holdings" and Millennium as the "Borrower"); *id.* at 474 (defining "Restricted Subsidiary").

[29] The Credit Agreement defines "Loan" as "any loan made by any Lender pursuant to th[e] [Credit] Agreement." *Id.* at 468. Here, each lender made a Loan to Millennium consisting of their allocated amount of the Term Loan.

[30] *Id.* at 539.

[31] *Id.* at 508; *see id.* at 382 (noting that Millennium's obligations under the Credit Agreement were "secured by a perfected first priority security interest in all of its tangible and intangible assets," subject to certain limitations). Additionally, if Millennium failed to timely pay back the lenders, Millennium had to pay a higher

The Credit Agreement also facilitated the creation of a secondary market for the Notes, subject to certain assignment restrictions. The restrictions include:

- A prohibition on assignment to "a natural person" [32];
- A requirement that Millennium and JP Morgan Chase, acting in its capacity as Administrative Agent, provide written consent to any assignment (subject to certain exceptions) [33]; and
- A requirement that any assignment be for more than $1,000,000, unless, among other things, the assignment was to a "Lender, an affiliate of a Lender, or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's" allocation.[34]

---

interest rate on the Term Loan, with such interest "payable from time to time on demand." *Id.* at 488.

[32] *Id.* at 546.

[33] *See id.* at 546–47.

[34] *Id.* at 547. The Credit Agreement defines "Approved Fund" as "any Person (other than a natural person or a Disqualified Lender) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an affiliate of a Lender or (c) an entity or an affiliate of an entity that administers or manages a Lender." *Id.* It defines "Person" as "an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature." *Id.* at 472. The "Disqualified Lender[s]" are specific entities listed on a schedule attached to the Credit Agreement. *Id.* at 456.

The Notes began trading on a secondary market "as early as April 15th."[35]

### G. Millennium Files for Bankruptcy

As the Transaction proceeded, the DOJ investigation and Ameritox litigation also continued. After the Transaction's April 16, 2014 closing, both took a material turn.

On June 16, 2014, a jury in the United States District Court for the Middle District of Florida determined that Millennium had violated federal anti-kickback statutes and awarded Ameritox $2.755 million in compensatory damages and $12 million in punitive damages.[36] The United States Court of Appeals for the Eleventh Circuit later vacated the verdict.[37]

In December 2014, the DOJ informed Millennium that it would intervene in *qui tam* litigation involving Millennium's billing practices. It did so on March 19, 2015. On May 22, 2015, Millennium announced that it had reached a preliminary $256 million global settlement with the government related to the *qui tam* litigation. On October 16, 2015,

---

[35] *Id.* at 51. The complaint alleges that "JP Morgan assigned a 'High Yield Research' Analyst" to monitor the secondary trading market and "to help disseminate non-confidential information about [Millennium]" to potential secondary-market purchasers of the Notes. *Id.* at 55.

[36] The United States District Court for the Middle District of Florida later lowered the punitive damages to $8.5 million. *See* J.A. 56.

[37] *See Ameritox, Ltd. v. Millennium Lab'ys, Inc.*, 803 F.3d 518, 541 (11th Cir. 2015).

Millennium completed the $256 million settlement. Soon thereafter, on November 10, 2015, Millennium filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

**H. This Litigation**

As part of the Chapter 11 bankruptcy proceedings, plaintiff was appointed trustee of the Millennium Lender Claim Trust (the "Trust"). The ultimate beneficiaries of the Trust are lenders who purchased Notes and have claims in the bankruptcy proceedings.

On August 1, 2017, plaintiff filed suit in the Supreme Court of the State of New York, New York County. He brought claims for violations of state securities laws, negligent misrepresentation, breach of fiduciary duty, breach of contract, and breach of the implied contractual duty of good faith and fair dealing.

On August 21, 2017, defendants filed a notice of removal to the United States District Court for the Southern District of New York pursuant to the Edge Act, 12 U.S.C. § 632. Plaintiff filed a motion to remand the cause to New York state court. On September 24, 2018, the District Court denied plaintiff's motion to remand after concluding that it had jurisdiction under the Edge Act.

On June 28, 2019, defendants moved to dismiss plaintiff's complaint. On May 22, 2020, the District Court granted defendants' motion to dismiss. It dismissed the state-law securities claims because it concluded that plaintiff failed to plead facts plausibly suggesting

that the Notes are "securities" under *Reves v. Ernst & Young*, 494 U.S. 56 (1990).

On July 31, 2020, plaintiff moved for leave to file a proposed amended complaint. On December 1, 2020, Magistrate Judge Sarah L. Cave issued a "Report and Recommendation" that recommended denying plaintiff's motion to amend the complaint as futile.

On September 30, 2021, the District Court adopted the Report and Recommendation and denied plaintiff's motion to amend the complaint as futile. Plaintiff timely appealed on October 28, 2021.

## II. DISCUSSION

We consider at the threshold whether the District Court had subject matter jurisdiction over this action pursuant to the Edge Act, 12 U.S.C. § 632. We hold that it did. We then turn to whether plaintiff plausibly suggested that the Notes are "securities" under *Reves v. Ernst & Young*, 494 U.S. 56 (1990). We hold that he did not.

### A. Edge Act Jurisdiction

Plaintiff challenges the District Court's determination that it had jurisdiction over this matter pursuant to the Edge Act, 12 U.S.C. § 632. We "review questions of subject matter jurisdiction *de novo*."[38]

Congress enacted the Edge Act in 1919 "to provide for the establishment of international banking and financial corporations

---

[38] *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

operating under Federal supervision with powers sufficiently broad to enable them to compete effectively with similar foreign-owned institutions in the United States and abroad."[39] Consistent with that purpose, the Edge Act "authorized the creation of banking corporations chartered by the Federal Reserve Bank, so-called 'Edge Act banks' or 'Edge Act corporations,' which could engage in offshore banking operations freed from regulatory barriers imposed by state banking commissioners."[40]

Congress amended the statute in 1933 to "provid[e] for federal court jurisdiction of certain suits to which . . . Edge Act banks [or corporations] were parties."[41] For a federal court to have jurisdiction

---

[39] 12 U.S.C. § 611a.

[40] *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 779 (2d Cir. 2013); *see* 12 U.S.C. § 611 (authorizing the formation of "[c]orporations to be organized for the purpose of engaging in international or foreign banking or other international or foreign financial operations, or in banking or other financial operations in a dependency or insular possession of the United states, either directly or through the agency, ownership or control of local institutions in foreign countries, or in such dependencies or insular possessions as provided by this subchapter and to act when required by the Secretary of the Treasury as fiscal agents of the United States").

[41] *Am. Int'l Grp.*, 712 F.3d at 779. Section 632 was added as part of the Banking Act of 1933, also known as the Glass-Steagall Act. *See* Banking Act of 1933, Pub. L. 73-66, § 15, 48 Stat. 162, 184. As relevant, § 632 provides that

> all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking, or banking in a dependency or insular possession of the United States, or out of other international or foreign financial

under the Edge Act, (1) the suit must be "of a civil nature at common law or in equity," (2) at least one party to the suit must be an Edge Act bank or corporation, and (3) the suit must "aris[e] out of transactions involving" (a) "international or foreign banking," (b) "banking in a dependency or insular possession of the United States," or (c) "out of other international or foreign financial operations."[42] We have clarified that to satisfy the third element, the party Edge Act bank or corporation must *itself* engage in the relevant "international or foreign banking," "banking in a dependency or insular possession of the United States," or "international or foreign financial operations."[43]

The parties agree that the first two elements are satisfied: They agree that the suit is civil in nature and that a party to this suit—JP Morgan Chase—is an Edge Act bank.[44] The parties disagree on whether the third element is satisfied. Specifically, they dispute

---

> operations, either directly or through the agency, ownership, or control of branches or local institutions in dependencies or insular possessions of the United States or in foreign countries, shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits.

[42] 12 U.S.C. § 632.

[43] *Am. Int'l Grp.*, 712 F.3d at 784 ("[Section] 632 provides that in order for its grant of federal jurisdiction and removability to apply, the suit must have a federally chartered corporation [*i.e.*, an Edge Act bank or corporation] as a party, and the suit must arise out of an offshore banking or financial transaction of that federally chartered corporation.").

[44] Citibank is also an Edge Act bank, but defendants "rely on [JP Morgan Chase's] transactions to establish Edge Act jurisdiction." Defs. Br. at 23 n.3.

whether JP Morgan Chase *itself* engaged in the relevant international or foreign banking.

We conclude that the third element is satisfied because JP Morgan Chase *itself* engaged in international or foreign banking as part of the Transaction. To effectuate the Transaction, JP Morgan Chase assigned its interest in the Term Loan to lenders.[45] That assignment constituted *banking*.[46] And JP Morgan Chase's assignment of its interest in the Term Loan "involv[ed] *international or foreign banking*"[47] because JP Morgan Chase directly assigned a portion of its interest in the Term Loan to *foreign* lenders.[48]

---

[45] *See, e.g.*, J.A. 432–35 (Assignment and Assumption Agreement between JP Morgan Chase and Brigade Credit).

[46] *See* 12 U.S.C. § 24 (authorizing banks "[t]o exercise . . . all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt . . . and by obtaining, issuing, and circulating notes"); *see also* Off. of the Comptroller of the Currency, Loan Participations, 1998 WL 161494, at *1 (Apr. 1998) ("The purchase and sale of loans and participations in loans are established banking practices.").

[47] 12 U.S.C. § 632 (emphasis added).

[48] *See, e.g.*, J.A. 432 (Assignment and Assumption Agreement between JP Morgan Chase and Brigade Credit, a foreign entity); *id.* at 343 (Decl. of Lyndon M. Tretter stating that two of the Parent Lenders are foreign entities); *id.* at 344 (listing foreign Child Lenders that received a sub-allocation of the Term Loan from Brigade); *see also Wilson v. Dantas*, 746 F.3d 530, 535 (2d Cir. 2014) (holding that an Edge Act bank engaged in "international or foreign financial operations" where it "contributed $750 million in return for stock in the [Brazilian] portfolio companies"); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 792–93 (2d Cir. 1980) (holding that an Edge Act bank engaged in "international or

Plaintiff does not contest that JP Morgan Chase assigned portions of the Term Loan to foreign lenders. Rather, he argues that the mere "fortuitous involvement" of the foreign lenders "in an otherwise domestic transaction is alone insufficient to trigger the [international or foreign banking] element."[49] The "involvement" of the foreign lenders, he explains, was "fortuitous" because JP Morgan Chase "was [not] involved in soliciting" the foreign lenders "into the [T]ransaction."[50] Plaintiff thus concludes that Edge Act jurisdiction is wanting.

We are unpersuaded by his argument. True, JP Morgan Chase did not solicit the foreign lenders into the Transaction. But that solicitation is not the relevant "international or foreign banking."[51] Rather, the relevant "international or foreign banking"[52] was JP Morgan Chase's direct assignment of portions of the Term Loan to foreign entities. JP Morgan Chase's deliberate choice to directly assign its interests in the Term Loan was also not "fortuitous," meaning

---

foreign" banking when it provided a letter of credit for the benefit of a New York corporation on a Venezuelan corporation's account).

[49] Pl. Br. at 21.

[50] *Id.* at 21, 23.

[51] 12 U.S.C. § 632.

[52] *Id.*

"accidental" or "[o]ccurring by chance."[53] Plaintiff does not allege, for example, that JP Morgan Chase *accidentally* assigned its interest in the Term Loan to foreign entities.

In sum, an Edge Act bank's direct assignment of a loan to a foreign entity qualifies as "international or foreign banking."[54] Accordingly, because each of the elements required to establish Edge Act jurisdiction is satisfied, the District Court correctly concluded that it had jurisdiction over this matter.

**B. Whether The Notes Are "Securities"**

We now turn to the second issue presented: whether the District Court erroneously dismissed plaintiff's state-law securities claims because he did not plausibly allege that the Notes are "securities" under *Reves v. Ernst & Young*, 494 U.S. 56 (1990).

We review a district court's decision to dismiss a claim under Federal Rule of Civil Procedure 12(b)(6) *de novo*.[55] "In assessing the complaint, we accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor."[56] But "conclusory

---

[53] *Fortuitous*, Black's Law Dictionary (11th ed. 2019); *see* Bryan A. Garner, *Garner's Modern English Usage* 409 (4th ed. 2016) ("[T]he word [fortuitous] is commonly misused for *fortunate*, in itself a very unfortunate thing.").

[54] 12 U.S.C. § 632.

[55] *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 175 (2d Cir. 2021).

[56] *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (en banc) (internal quotation marks and citation omitted).

allegations are not entitled to the assumption of truth, and a complaint will not survive a motion to dismiss unless it contains sufficient factual matter, accepted as true, to state a claim that is plausible on its face."[57]

The parties agree that to determine whether the Notes are "securities," we should apply the test enunciated by the Supreme Court in *Reves*.[58] There, the Supreme Court explained that although the Act defines "security" to include "any note,"[59] the "phrase 'any

[57] *Id.* at 72 (internal quotation marks, citation, and brackets omitted). Plaintiff asserts that because determining whether a note is a "security" is "fact-intensive," it is "not appropriately resolved on a motion to dismiss." Pl. Br. at 30 (quoting *SEC v. Rorech*, 673 F. Supp. 2d 217, 225 (S.D.N.Y. 2009)). That a claim is fact-intensive does not preclude dismissal under Rule 12(b)(6) if the plaintiff fails to allege facts plausibly supporting a claim upon which relief can be granted. *Cf. Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 195 n.6 (2016) ("We reject [plaintiff's] assertion that materiality is too fact intensive for courts to dismiss False Claims Act cases on a motion to dismiss or at summary judgment.").

[58] The *Reves* test is used to determine whether notes are "securities" under both the Securities and Exchange Act of 1934 (the "1934 Act") and the Securities Act of 1933 (the "1933 Act"). *See* 494 U.S. at 60 (determining whether a note is a "security" under the 1934 Act); *Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 973 F.2d 51, 55–56 (2d Cir. 1992) (applying the *Reves* test to claims brought under the 1933 Act). Plaintiff did not bring claims under either of those statutes. Instead, he brought claims under the state-securities laws of California, Massachusetts, Colorado, and Illinois. We, like the District Court, "accept[] [p]laintiff's assertion that *Reves* applies to [his] claims under California, Colorado, Illinois, and Massachusetts law." Special App'x 40. We accordingly proceed to examine the Notes under *Reves*.

[59] 15 U.S.C. § 78c(a)(10). The 1934 Act defines "security" in full as:

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or

note' should not be interpreted to mean literally 'any note.'"[60] It reasoned that Congress's goal in enacting the Securities Act of 1933 and the 1934 Act (together, the "Securities Acts") was to regulate the investment market and not to provide a "broad federal remedy for all fraud."[61] Accordingly, only "notes issued in an investment context" are "securities."[62] By contrast, notes "issued in a commercial or consumer context" are not.[63]

---

> lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

*Id.* The 1934 Act's "definition of security . . . is virtually identical" to the 1933 Act's definition of "security." *Tcherepnin v. Knight*, 389 U.S. 332, 342 (1967).

[60] *Reves*, 494 U.S. at 63.

[61] *Id.* at 61 (internal quotation marks and citation omitted).

[62] *Id.* at 63.

[63] *Id.*

Under *Reves*, courts must apply a "family resemblance" test to determine whether a "note" is a "security." The test "begin[s] with a presumption that every note is a security."[64] It then directs courts to examine four factors, each of which helps to uncover whether the note was issued in an investment context (and is thus a security) or in a consumer or commercial context (and is thus not a security).[65] The four factors are:

1) "[T]he motivations that would prompt a reasonable seller and buyer to enter into" the transaction[66];
2) "[T]he plan of distribution of the instrument" [67];
3) "[T]he reasonable expectations of the investing public" [68]; and
4) "[W]hether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary."[69]

---

[64] *Id.* at 65.

[65] *See id.* at 68–69 ("We have consistently identified the fundamental essence of a 'security' to be its character as an 'investment.'").

[66] *Id.* at 66.

[67] *Id.* (internal quotation marks and citation omitted).

[68] *Id.*

[69] *Id.* at 67.

In balancing the four factors, courts compare the note at issue to an existing "judicially crafted" list of instruments that are not securities.[70] If "the note bears a strong resemblance" to one of the instruments on that list, then we conclude that the note is not a security.[71] That a note does *not* bear a strong resemblance to an item on the list is not dispositive. The test allows courts to expand the list of non-security instruments to include the type of note at issue if, based on the four factors, a court concludes that the note is not a security.[72]

**1. The Motivations of the Parties**

The first *Reves* factor requires us to "examine the transaction to assess the motivations that would prompt a reasonable seller and

---

[70] *Id.* at 64; *see id.* at 67. At the time *Reves* was decided, that list included "the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, . . . a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)[,] . . . [and] notes evidencing loans by commercial banks for current operations." *Id.* at 65 (internal quotation marks and citation omitted); *see also Banco Espanol*, 973 F.2d at 56 (identifying "loans issued by banks for commercial purposes" as one of "the enumerated categor[ies]" of instruments that are not securities).

[71] *Id.* at 67.

[72] *See id.* ("If an instrument is not sufficiently similar to an item on the list, the decision whether another category should be added is to be made by examining the same factors.").

buyer to enter into it."[73] We must determine "whether the motivations [of the seller and buyer] are investment (suggesting a security) or commercial or consumer (suggesting a non-security)."[74] A buyer's motivation is investment if it expects to profit from its investment, including through earning either variable or fixed-rate interest.[75] A seller's motivation is investment if its "purpose is to raise money for the general use of a business enterprise or to finance substantial investments."[76] A seller's motivation is commercial if, for example, "the note is exchanged to facilitate the purchase and sale of a minor

---

[73] *Id.* at 66.

[74] *Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 812 (2d Cir. 1994).

[75] *See Reves*, 494 U.S. at 68 n.4 ("We emphasize that by 'profit' in the context of notes, we mean 'a valuable return on an investment,' which undoubtedly includes interest."); *Pollack*, 27 F.3d at 813 (observing that it was "not . . . a close question" that the buyers of bonds had an investment motivation where they would earn "a fixed rate of return in the form of interest" on the bonds).

Defendants assert that "[a]lthough the fixed rate of return on the loan does not by itself preclude the existence of a security, it is highly relevant that the lenders' return was not tied to Millennium's market performance." Defs. Br. at 40 (citation omitted). To the contrary, that a lender's return is not tied to market performance is *not* highly relevant to whether a "note" is a "security" under *Reves*. The Supreme Court in *Reves* explicitly rejected a definition of "profit" that would "suggest that notes paying a rate of interest not keyed to the earning of the enterprise are not 'notes' within the meaning of the Securities Acts." *Reves*, 494 U.S. at 68 n.4. Instead, the Supreme Court "emphasize[d]" that, in "the context of notes," profit means "a valuable return on an investment." *Id.* A fixed rate of return is undoubtedly "a valuable return on an investment." *Id.*

[76] *Reves*, 494 U.S. at 66; *id.* at 67–68 (concluding that a seller's motivation was investment where it "sold the notes in an effort to raise capital for its general business operations").

asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose."[77]

On the one hand, the pleaded facts plausibly suggest that the *lenders'* motivation was investment because the lenders expected to profit from their purchase of the Notes. Under the Credit Agreement, the lenders were entitled to receive quarterly interest payments over the course of seven years. They therefore expected to receive a "valuable return"[78] on their purchase of the Notes.

On the other hand, the pleaded facts do not plausibly suggest that *Millennium's* motivation was investment. Millennium was not using the Term Loan to raise funds for its urine testing business or to finance other investments. Instead, it planned to use the Term Loan to pay the outstanding amount due under the 2012 Credit Agreement, make a shareholder distribution, "redeem outstanding warrants, debentures and stock options," and pay fees and expenses related to the Transaction.[79] These uses suggest that Millennium's motivation was commercial.

Accordingly, the pleaded facts indicate that the parties' motivations were mixed.[80] At this early stage of litigation, our

---

[77] *Id.* at 66.

[78] *Id.* at 68 n.4.

[79] J.A. 582.

[80] Plaintiff does not argue that Millennium's motivation was investment. He argues only that Millennium's motivation was not commercial because there was

application of the first *Reves* factor tilts in favor of concluding that the complaint plausibly alleges that the Notes are securities.

**2. The Plan of Distribution**

The second *Reves* factor requires us to "examine the plan of distribution of the instrument to determine whether it is an instrument in which there is common trading for speculation or investment."[81] This factor weighs in favor of determining that a note is a security if it is "offered and sold to a broad segment of the public."[82] This factor weighs against determining that a note is a security if there are limitations in place that "work[] to prevent the [notes] from being sold to the general public."[83]

The pleaded facts do not plausibly suggest that the Notes were "offered and sold to a broad segment of the public."[84] The Lead Arrangers offered the Notes *only* to sophisticated institutional entities, providing them with a Confidential Information Memorandum. JP Morgan then proceeded to allocate the Notes to *only* the sophisticated

---

"no commercial purpose in assuming [the] additional $1.4 billion of debt." Pl. Br. at 34. The upshot of plaintiff's argument is that Millennium's motivations were neither investment nor commercial. The *Reves* test, however, requires us to categorize Millennium's motivation as either investment or commercial.

[81] *Reves*, 494 U.S. at 66 (internal quotation marks and citations omitted).

[82] *Id.* at 68.

[83] *Banco Espanol*, 973 F.2d at 55.

[84] *Reves*, 494 U.S. at 68.

institutional entities that submitted "legally binding offer[s]."[85] This allocation process was not a "broad-based, unrestricted sale[] to the general investing public."[86]

Plaintiff points to the presence of a secondary market as evidence that the Notes were "offered and sold to a broad segment of the public."[87] But the restrictions on any assignment of the Notes rendered them unavailable to the general public. The Notes could not be assigned to a "natural person."[88] Nor could they be assigned without prior written consent from *both* Millennium *and* JP Morgan Chase, acting in its capacity as Administrative Agent, unless an assignment was being made to a "Lender, an affiliate of a Lender or an approved fund."[89] Nor could any assignment total more than $1,000,000, unless it was to a "Lender, an affiliate of a Lender, or an Approved Fund or an assignment of the entire remaining amount of the assigning Lenders[']" allocation.[90]

---

[85] J.A. 50.

[86] *Pollack*, 27 F.3d at 814.

[87] *Reves*, 494 U.S. at 68.

[88] J.A. 546.

[89] *Id.* at 546–47.

[90] *Id.* at 547. Plaintiff challenges the stringency of these restrictions by noting that Millennium "shall be deemed to have consented" to a requested assignment if it does not object "within five Business Days after having received telecopy or electronic written notice thereof." *Id.* at 546; *see* Reply Br. at 20–21. The fact remains, however, that Millennium's consent *was* required in one form or another.

The assignment restrictions here are akin[91] to those in *Banco Espanol de Credito v. Security Pacific National Bank* that we held weighed against concluding that the relevant loan participations were securities.[92] In *Banco Espanol*, "[t]he plan of distribution specifically prohibited resales of the loan participations without the express written permission of [the issuer][,] . . . . [which] worked to prevent the loan participations from being sold to the general public, thus limiting eligible buyers to those with the capacity to acquire information about the debtor."[93] The collective impact of the assignment restrictions here likewise works to prevent the Notes from being sold to the general public.[94]

---

[91] Moreover, the plan of distribution for the Notes is unlike those found to render notes broadly available. *See, e.g.*, *Reves*, 494 U.S. at 68 (deciding that the second factor weighed in favor of the conclusion that the notes were securities because the issuer, an agricultural cooperative, "offered the notes over an extended period to its 23,000 members, as well as to nonmembers"); *Pollack*, 27 F.3d at 814 (concluding that "the broad-based, unrestricted sales to the general investing public alleged in the complaint support[ed] a finding that these instruments are within the scope of the federal securities laws").

[92] "A loan participation is a sharing or selling of ownership interests in a loan between two or more financial institutions." *FDIC Manual*, *supra* note 1, § 3.2-41. In a typical loan participation, a single institution "originates the loan," and then "sells ownership interests to one or more participating banks." *Id.* A syndicated loan is different in that *multiple* institutions "participate jointly in the [loan] origination process." *Id.* § 3.2-73.

[93] 973 F.2d at 55.

[94] Plaintiff objects that despite the similar restrictions on assignments, *Banco Espanol* is distinguishable because the loan participations there were "distributed to only 11 investors," whereas here the Notes "were distributed to more than 400

Accordingly, this factor weighs against concluding that the complaint plausibly alleges that the Notes are securities.

**3. The Public's Reasonable Perceptions**

The third *Reves* factor requires us to "examine the reasonable expectations of the investing public."[95] We "consider [notes] to be 'securities' on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the [notes] are not 'securities' as used in that transaction."[96] If buyers were "given ample notice that the instruments were . . . loans and not investments in a business enterprise," it suggests that the instruments are not securities.[97]

---

investors." Reply Br. at 12. Although the number of purchasers may be probative of whether the note is broadly available to the general public, in the circumstances presented here, the Notes' distribution to more than 400 lenders did not render them available "to a broad segment of the public." *Reves*, 494 U.S. at 68.

[95] *Reves*, 494 U.S. at 66.

[96] *Id.* Relying on this language, plaintiff asserts that the third *Reves* factor works "as a one-way ratchet" and that a "failure to satisfy it *does not* weigh against a finding that a[n] instrument is a security." Pl. Br. at 41 (first quoting *Stoiber v. SEC*, 161 F.3d 745, 751 (D.C. Cir. 1998), then quoting *Fox v. Dream Tr.*, 743 F. Supp. 2d 389, 400 (D.N.J. 2010)). We think plaintiff is incorrect. All that language from *Reves* means is that an instrument is a security if the public reasonably expects that the instrument is a security, even if the other three factors weigh *against* concluding that the instrument is a security. If the public does *not* reasonably expect that an instrument is a security, then the third *Reves* factor will be considered alongside the other *Reves* factors.

[97] *Banco Espanol*, 973 F.2d at 55.

The pleaded facts do not plausibly suggest that the lenders reasonably perceived the Notes as securities. Instead, we are persuaded that the sophisticated entities that purchased the Notes "were given ample notice that the [Notes] were . . . loans and not investments in a business enterprise."[98] Before purchasing the Notes, the lenders certified that they were "sophisticated and experienced in extending credit to entities similar to [Millennium]."[99] They also certified that they had "independently and without reliance upon any Agent or any Lender, and based on such documents and information as [they] ha[ve] deemed appropriate, made [their] own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of [Millennium] and made [their] own decision to make [their] Loans hereunder."[100] This certification is substantively identical to the certification made by the purchasers in *Banco Espanol*, which was central to our determination that the buyers there could not have reasonably perceived the loan participations as securities.[101]

---

[98] *Id.*

[99] J.A. 566.

[100] *Id.* at 539.

[101] In *Banco Espanol*, "sophisticated purchasers" entered a "Master Participation Agreement" under which they "acknowledge[d] that [they] ha[d] independently and without reliance upon [the bank] and based upon such documents and information as the [sophisticated purchaser had] deemed appropriate, made [their] own credit analysis." 973 F.2d at 53, 55.

Plaintiff argues that the fact that the loan documents at times refer to the buyers as "investors" plausibly suggests that the buyers reasonably expected that the Notes were securities.[102] We disagree. First, there are only isolated references to "investors" in the loan documents. These isolated references could not have plausibly created the *reasonable* expectation that the buyers were investing in securities.[103] Second, the loan documents more consistently refer to the buyers as "lenders." This label aligns with the reasonable expectations of the experienced entities that the Notes were not securities.

In sum, this factor weighs against concluding that the complaint plausibly alleges that the Notes are securities.[104]

---

[102] *See* J.A. 561 (referring to "Public Side Investors"); *id.* at 572 (providing a "Public investors dial-in" number).

[103] Likewise, under these circumstances, JP Morgan's assignment of a "High Yield Research Analyst" to track the secondary market could not plausibly have made the experienced lenders *reasonably* believe that they were investing in securities. *See id.* at 55.

[104] The District Court suggested that the third *Reves* factor weighed against finding that the Notes are securities because plaintiff "cited no case in which a court has held that a syndicated term loan is a 'security.'" Special App'x 47. That reasoning is circular. It would mean that no court could *ever* find that the reasonable expectations of the investing public are that a syndicated term loan is a security. As *Reves* instructs, in assessing whether a given note is a security, "we are not bound by legal formalisms, but instead take account of *the economics of the transaction under investigation*." 494 U.S. at 61 (emphasis added). It is possible that a court faced with a different transaction could find that the reasonable investing public perceived an instrument labelled a "syndicated term loan" to be a "security." *Cf. id.* ("Congress' purpose in enacting the securities laws was to regulate

### 4. Whether some other risk-reducing factor renders application of securities laws unnecessary

The fourth *Reves* factor requires us to "examine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary."[105] Among the factors that reduce the risks associated with an instrument are whether the instrument is secured by collateral or is insured[106] and whether "specific policy guidelines"[107] issued by federal regulators address the type of instrument at issue.

*investments*, in whatever form they are made and by whatever name they are called.").

[105] *Reves*, 494 U.S. at 67.

[106] *See Reves*, 494 U.S. at 69 (finding "no risk-reducing factor to suggest that [the notes at issue] are not in fact securities," in part because they were "uncollateralized and uninsured"); *Pollack*, 27 F.3d at 814 (observing in connection with the analysis of the fourth *Reves* factor that the "amended complaint specifically alleges that the mortgage participations were 'not secured' and were 'uncollateralized'"). "Collateral" is "[p]roperty that is pledged as security against a debt." *Collateral*, Black's Law Dictionary (11th ed. 2019); *see FDIC Manual*, *supra* note 1, § 3.2-66 (describing the requirements for establishing a perfected security interest in collateral).

[107] *Banco Espanol*, 973 F.2d at 55.

The pleaded facts do not plausibly suggest that application of securities laws[108] are necessary here for two reasons.[109] First, the Notes were "secured by a perfected first priority security interest in all of [Millennium's] tangible and intangible assets," *i.e.*, Millennium's collateral.[110] That perfected first priority security interest reduces the risk associated with the Notes. Second, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation (jointly, the "Bank Regulators") issued "specific policy guidelines"[111] addressing syndicated term loans.[112]

Plaintiff contends that the Bank Regulators' guidance does not constitute "another regulatory scheme [that] significantly reduces the risk of the"[113] Notes "because the Bank Regulators' guidance merely addresses risk management controls to ensure sound banking

---

[108] Plaintiff does not argue that our analysis of the fourth *Reves* factor is affected by the fact that he brought claims under state securities laws as opposed to the Securities Acts.

[109] *Reves*, 494 U.S. at 67.

[110] J.A. 382–83.

[111] *Banco Espanol*, 973 F.2d at 55 (concluding that the fourth *Reves* factor weighed against concluding that the loan participations were securities where "the Office of the Comptroller of the Currency has issued specific policy guidelines addressing the sale of loan participations").

[112] *See, e.g.*, *Interagency Guidance on Leveraged Lending*, 78 Fed. Reg. 17766, 2013 WL 1154182 (Mar. 22, 2013); *Comptroller's Handbook*, *supra* note 12.

[113] *Reves*, 494 U.S. at 67.

practices and minimize risks to *banks*" and "does not address risks to investors."[114] Although it is true that the guidance aims to minimize risks to banks, in doing so it also aims to protect consumers. For example, the Bank Regulators have explained that the purpose of "supervisory guidance [is to] provide[] examples of practices that the [Bank Regulators] generally consider[] consistent with safety-and-soundness standards or other applicable laws and regulations, *including those designed to protect consumers*."[115] Moreover, we already considered and rejected the argument raised by plaintiff here in *Banco Espanol*.[116] We were unpersuaded then, and plaintiff offers no compelling reason to revisit that decision now.[117]

---

[114] Pl. Br. at 45. Plaintiff does not argue that the issued guidance is ineffective in minimizing risks to banks.

[115] 12 C.F.R. § 262, App. A (2021) (emphasis added); *see also id.* § 4, Subpt. F, App. A (same); *id.* § 302, App. A (same).

[116] *See* Brief of the SEC as Amicus Curiae at 40–41, *Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 973 F.2d 51 (2d Cir. 1992), 1992 WL 12936369. In *Banco Espanol*, the Securities and Exchange Commission ("SEC") argued, as amicus curiae, that the "guidelines [issued by the Office of the Comptroller of the Currency] for national banks purchasing loan participations" were insufficient to render application of the Securities Acts unnecessary because they "addressed . . . steps *national banks* should take before they *purchase* loan participations" and had "no applicability" as to the "plaintiff purchasers" because "none are national banks." *Id.* at 37, 40–41.

[117] Nor does the SEC. Following argument in this case, we entered an order "solicit[ing] any views that the [SEC] may wish to share on th[e] issue" of whether the Notes are securities under *Reves*. Order, *Kirschner v. JP Morgan Chase Bank, N.A.*, No. 21-2726 (2d Cir. Mar. 16, 2023), ECF No. 170. After receiving several extensions of time to file its response to our invitation to provide its views on this question,

Accordingly, this factor weighs against concluding that the complaint plausibly alleges that the Notes are securities.

***

To summarize our application of the *Reves* factors to the pleaded facts:

- The first factor—the motivations of the parties—weighs *in favor of* concluding that the complaint plausibly suggests that the Notes are securities because, although Millennium's motivation appears to be "commercial," the lenders' motivations were "investment."
- The second factor—the plan of distribution—weighs *against* concluding that the complaint plausibly suggests that the Notes are securities because they were unavailable to the general public by virtue of restrictions on assignments of the Notes.
- The third factor—the reasonable expectations of the public—weighs *against* concluding that the complaint plausibly suggests that the Notes are securities because the lenders were sophisticated and experienced institutional entities with ample notice that the Notes were not securities.

---

the SEC notified the Court that "[d]espite diligent efforts to respond to the Court's order and provide the [SEC's] views, the staff is unfortunately not in a position to file a brief on behalf of the [SEC] in this matter." Letter on behalf of Amicus Curiae SEC, *Kirschner*, No. 21-2726 (2d Cir. July 18, 2023), ECF No. 207.

- The fourth factor—the existence of other risk-reducing factors—weighs *against* concluding that the complaint plausibly suggests that the Notes are securities because they were secured by collateral and federal regulators have issued specific policy guidance addressing syndicated loans.

Upon our review of the pleaded facts, we conclude that the Notes, like the loan participations in *Banco Espanol*, "bear[] a strong resemblance"[118] to one of the enumerated categories of notes that are not securities: "[L]oans issued by banks for commercial purposes."[119] We accordingly hold that plaintiff has failed to plead facts plausibly suggesting that the Notes are securities under *Reves v. Ernst & Young*, 494 U.S. 56 (1990). The District Court therefore properly dismissed plaintiff's state-law securities claims.

## III. CONCLUSION

In sum, we hold as follows:

1) The District Court had jurisdiction over this action pursuant to the Edge Act because defendant-appellee

[118] *Reves*, 494 U.S. at 67.

[119] 973 F.2d at 55–56 ("[U]nder the *Reves* family resemblance analysis . . . we hold that the loan participations in the instant case are analogous to the enumerated category of loans issued by banks for commercial purposes and therefore do not satisfy the statutory definition of 'notes' which are 'securities.'").

JP Morgan Chase Bank, N.A. engaged in international or foreign banking as part of the Transaction; and

2) The District Court properly dismissed plaintiff's state-law securities claims because he failed to plead facts plausibly suggesting that the Notes are securities under the "family resemblance" test established by the Supreme Court in *Reves v. Ernst & Young*, 494 U.S. 56 (1990).

We accordingly **AFFIRM** the District Court's September 24, 2018 order determining that it had jurisdiction over this matter pursuant to the Edge Act and **AFFIRM** its May 22, 2020 order dismissing plaintiff's state-law securities claims.